**BOWLES, Adm'r, Office of Price Administration, v. ARLINGTON FURNITURE CO. et al.**

**SAME v. FADER MACHINERY CO., Inc.**

**SAME v. HART et al.**

**Nos. 8582–8584.**

Circuit Court of Appeals, Seventh Circuit.

March 30, 1945.

468

Edward Rothbart, Julius M. Rosenfield, J. H. Schwartz, Edward A. Cooper, Benjamin S. Mesirow, Simon H. Alster, Alster, Berger & Wald, and Ira S. Kolb, all of Chicago, Ill. (J. M. Lorenz, of Chicago, Ill. of counsel), for appellants.

Fleming James, Jr., Office of Price Administration, of Washington, D. C., Alex Elson, Harry Witherell, Allen Heald, and Abraham H. Maller, Office of Price Administration, all of Chicago, Ill. and Thomas I. Emerson, Deputy Adm'r, David London, Chief, Appellate Branch, and A. M. Dreyer, Atty., Office of Price Administration, all of Washington, D. C., for appellee.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

These are three separate appeals from an order of the District Court, entered January 10, 1944, awarding a permanent injunction, in an action instituted by the Administrator of the Office of Price Administration, in which defendants were found to have violated the ceiling price provided in Maximum Price Regulation No. 136 (7 Fed.Reg. 5362). The appeals may appropriately be considered and disposed of in the same opinion. In the beginning we shall identify the parties. Appellee in all of the appeals is the Administrator of the Office of Price Administration (referred to as the Administrator or the O.P.A.); the appellants in 8582 are Arlington Furniture Company (referred to as Arlington or the seller), Philip W. Pelts (referred to as Pelts), the President and Managing Officer of Arlington, Samuel L. Winternitz & Company (referred to as Winternitz or the auctioneer), the auction company which conducted a public sale on behalf of Arlington, at which the alleged violations took place; the appellant in 8583 is Fader Machinery Co., Inc. (referred to as Fader); and in 8584, the appellant is Earle Hart and Claude S. Sutton, doing business as Earle Hart Woodworking Machine Co. (referred to as Hart). Both Fader and Hart were purchasers, or at any rate bidders, on machinery offered at Arlington's public auction.

Regulation 136 provided that used woodworking machinery could be sold on an "as is" basis of not more than 55% of the base price, and as "rebuilt and guaranteed" machines of not more than 85% of the base price. A "rebuilt and guaranteed" machine was defined in the Regulation as one "in which all worn or missing components which should be replaced or repaired for satisfactory operation have been replaced or repaired, and which carries a binding guaranty of satisfactory operation for a period of not less than 60 days, and which is expressly invoiced as a rebuilt and guaranteed machine or part."

The issues presented here may be classified in the main as (1) the findings of the trial court are not supported by the proof,

and (2) in any event, the circumstances of the case do not justify the issuance of an injunction.

Arlington was the owner of a large factory building at DeKalb, Illinois, where it was engaged in the business of manufacturing upholstered furniture. In September, 1942, the United States Navy gave notice that it would take the building for war purposes, with a requirement that Arlington relinquish possession not later than October 25, 1942. In order to give possession to the Navy, an auction sale of the machinery was arranged. Winternitz, an auctioneer of many years' experience, was engaged to conduct the sale, which was held on October 21. The auctioneer was advised by Pelts as to which machines were to be sold "as is" and which were to be sold as "rebuilt and guaranteed."

The instructions given by Pelts were based upon a report made by an independent inspector that Arlington had procured for that purpose. Of the forty-five machines sold or offered for sale, ten were offered as "rebuilt and guaranteed." Of these ten, only five are alleged to have been sold in violation of Regulation 136. Of these, three Tannewitz band saws were sold to Fader on a bid slightly less than 70% of the base price. One Onsrud router was sold to Hart, who bid "ceiling." A number of other prospective purchasers made a like bid on this machine and, by lot, Hart was selected as the successful bidder. One Jones Superior band saw was sold to Gustafson & Scott Manufacturing Company for approximately 65% of the base price. (Gustafson & Scott has not appealed, so we are not directly concerned with this sale.) Thus, it will be observed that of the forty-five machines offered for sale only four are actually involved in this litigation.

It seems not inappropriate at this point to make a few general observations. We are convinced from a reading of the entire record that this dispute, as well as much of the apparent conflict between witnesses for the respective parties, is due in the main to the divergent interpretations which were placed upon Regulation 136. Even the representatives of the O.P.A. disagreed as to its meaning. Some of them thought that before a machine could be sold as a "rebuilt and guaranteed" machine in excess of 55% of the base price, it must actually be rebuilt, that is, dismantled and reassembled. A literal reading of the Regulation appears to support this interpretation. Fader and Hart, as well as the other machine dealers, contended for this interpretation. Other representatives of the O.P.A., however, placed a different interpretation upon the Regulation, including the regional attorney for the O.P.A. in Chicago, who, in response to an inquiry from the attorneys for Arlington, in a letter dated October 2, 1942, stated: "The regulation does not require that the machinery be rebuilt or repaired if it is not necessary to do so." Subsequently, the latter interpretation was adopted as official by the O.P.A.

The reason machinery dealers were interested in the former interpretation is obvious. Such interpretation would in the main preclude those not engaged in the business of rebuilding, such as Arlington, from selling machines, however good their condition be, on a basis above 55%. Other conflict in the testimony, especially that given by so-called experts, arises, so we think, from the uncertain meanings of the words "satisfactory operation" as contained in the Regulation. That which is satisfactory to one person might be entirely unsatisfactory to another, and so whether a machine was capable of "satisfactory operation" depended upon the view or opinion of the witness.

We do not agree with Arlington's contention that this court may weigh the evidence with a view of substituting its judgment for that of the trial court on the factual situation. Whatever the rule might previously have been, it now appears plain by reason of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, that the findings of the trial court must be accepted unless "clearly erroneous." Cf. Guilford Const. Co. v. Biggs, 4 Cir., 102 F.2d 46; Wertz v. National City Bank of Evansville, 7 Cir., 115 F.2d 65.

The court found that the appellants Arlington, Pelts and Winternitz sold and that the appellants Fader and Hart purchased at the public sale the machinery as alleged, at prices in excess of the maximum, for the reason that said machines did not qualify as "rebuilt and guaranteed" within the terms of the Regulation. The court also found that all of the parties had knowledge of the condition of the machines and that they could not be sold as "rebuilt and guaranteed" machines within the meaning of the Regulation.

As already stated, Arlington conferred with the O.P.A. and obtained an interpretation of Regulation 136 before it employed the auctioneer. Also, as already observed, the machinery dealers were attempting to obtain a different interpretation of the Regulation. On three or four different occasions, Arlington conferred with officials of O.P.A. regarding the method of determining what, if any, of the machinery could be sold as rebuilt. Such conferences, or some of them, were attended by attorneys whom Arlington had employed to advise it, as well as by the auctioneer whom it had employed to conduct the sale. Arlington suggested to the O.P.A. that it send a machinery expert of its own, at Arlington's expense, to examine the machinery proposed to be sold and agreed to rely upon the findings of such expert as to which machines could and which could not be offered as "rebuilt and guaranteed." This the O.P.A. declined to do. Arlington also attempted to have a representative of the O.P.A. attend the sale. Arlington then suggested to O.P.A. that it would have its own maintenance crew go over the machinery and also have an independent machinery expert examine it a day or two before the proposed auction sale and advise which machines were in a condition to be sold as "rebuilt and guaranteed," and that it would rely upon the opinion of such expert.

Arlington employed one Knourek, whose qualifications are not in dispute, to inspect and appraise the machines. In brief, he testified that he examined all of the machinery on the day before the sale, that he applied power and inspected every part of each machine. His report as to the condition of the machines was the basis upon which they were classified and offered for sale at the auction. Arlington also offered the testimony of its Superintendent in charge of machinery, who had worked with machinery of this character for more than thirty years. He testified as to the condition of each machine and corroborated the testimony of Knourek.

Shortly after the sale, Fader, the bidder on the three Tannewitz band saws, and Hart, the bidder on the Onsrud router, conferred with the O.P.A. regarding the bids they had made. It appears that Fader and Hart were still of the view that the machines which they had purchased should have been sold on a basis of not to exceed 55%. It also appears that their view

in this respect was attributable to the interpretation which they thought should be placed upon the Regulation rather than the actual condition of the machines upon which they had bid. Arlington was advised of the situation resulting from the attitude taken by Fader and Hart at their meeting with the O.P.A. Another meeting with the O.P.A. was had, attended by practically all the parties, including Arlington's President, its attorneys and the auctioneer. Again Arlington suggested that O.P.A. send a man to examine the machines, with the view of ascertaining the price at which they could be lawfully sold. It insisted that this be done prior to October 25, as the premises had to be cleared by that date to make room for the Navy. Again the O.P.A. neglected or refused to make such inspection.

Thereupon, Fader and Hart each tendered to Arlington two checks, one on a basis of 55% (ceiling on an "as is" machine) and the other for the difference between that amount and the amount bid. The latter checks were issued under protest, conditioned on approval of their bids by O.P.A. Arlington refused to accept the checks under these circumstances, and O.P.A. failed either to approve or disapprove the sales.

Shortly thereafter, Fader and Hart removed the machines to their respective premises. Thereupon, Arlington rescinded the sales and instituted replevin suits in an Illinois state court to recover possession of such machinery. Fader and Hart filed answers, denying that Arlington was entitled to possession, and also filed forthcoming bonds. It is stated by Fader and Hart that Arlington's replevin suits were resisted by them at the suggestion of the O.P.A. At any rate, the replevin suits are still pending and the machinery is in the possession of Fader and Hart.

About five or six days after the auction, the O.P.A. sent a so-called expert to examine the machinery then in the possession of Fader and Hart, with the view of ascertaining if its condition was such as to permit its sale by Arlington and its purchase by Fader and Hart as rebuilt machinery within the meaning of Regulation 136. This witness described numerous worn and missing components which, according to his opinion, should be replaced or repaired for satisfactory operation. This testimony was strenuously objected to by Arlington on the ground that there was

no showing the machinery was in the same condition when examined by this witness as it was on the day of the sale. It was admitted on plaintiff's promise to show that it was in the same condition. Numerous witnesses were called by plaintiff, including some of the defendants as adverse witnesses and the person who hauled the machinery from the auction premises to the premises of the defendants, for the purpose of showing that it was in the same condition.

■ We are not greatly impressed either with the testimony of plaintiff's expert or the showing which was made that the condition of the machinery remained unchanged. If we were the trier of the facts, we would accept the positive direct testimony offered by Arlington as to the condition of the machinery at the time of the sale in preference to the uncertain and opinionated testimony offered by the O.P.A. However, we cannot say that the action of the trial court in accepting the testimony offered by the O.P.A. is clearly erroneous. Such being the case, we accept the finding that the condition of the machinery at the time of the auction was such that it did not comply with Regulation 136 as to rebuilt machinery and that its sale by Arlington and its purchase by Fader and Hart constituted a violation.

■ We are unable, however, to accept the finding that either the seller or the purchasers had knowledge at the time of the sale that the machines in question could not be sold as "rebuilt and guaranteed" machines. Certainly there is no basis for such finding as to Arlington. We think without doubt that it did everything which could be expected of an honest, careful, prudent business firm to ascertain whether the machines could be classified as rebuilt within the meaning of the Regulation. That it did not act in reckless disregard of the Regulation is evidenced by the fact that of forty-five machines sold only ten were sold as rebuilt and no question was raised except as to the five involved in the suit in the lower court. That it exercised more than ordinary caution in attempting to ascertain its rights in the matter is plainly shown. It is unreasonable to think that it would have invited and insisted that a representative of the O.P.A. attend the sale if it had planned knowingly to violate the Regulation. Also, we do not think the fact that Arlington rescinded the sales and instituted replevin suits when a dispute developed is any recognition by it of knowledge that it had violated the Regulation.

Neither do we find any support for the finding that Fader and Hart had knowledge that the machinery was being offered for sale in violation of the Regulation. Of course, they knew that it did not comply with the Regulation according to the interpretation which they sought from O.P.A. This, however, as shown, was a matter of dispute. They relied, as we think they had a right to do, upon the representation of the seller that it was in proper condition to be sold as rebuilt. We are not impressed with the argument that because Fader and Hart reported to the O.P.A. what had happened at the sale and refused to make an unconditional settlement with Arlington is any indication that they had knowledge that the Regulation had been violated by them. Again it is pertinent to observe that they made no complaint as to the condition of the machinery which they had purchased, but it is shown, plainly so we think, that the doubt which they had was occasioned by the confusion which existed as to the proper interpretation of the Regulation. We suppose it is true, at any rate it would be natural, that Arlington on the one side and Fader and Hart on the other were interested in an interpretation which would serve their own business interests. Even so, we think that no sinister inference can be drawn therefrom.

What we have said as to Arlington is applicable to Pelts, its managing officer who was in active charge of the sale and who was responsible for what took place.

■■ As to Winternitz, we are satisfied that the suit as to him should have been dismissed. There is no proof that he had any knowledge of the condition of the machines which he sold on behalf of Arlington. He arrived at the sale only shortly before it commenced and was informed by Pelts as to the machines which were to be sold as rebuilt. It was conceded by counsel for O.P.A. during oral argument before this court that he had no knowledge as to the condition of the machines which would preclude their sale as rebuilt. Also, we are of the view that Regulation 136 has no application to an auctioneer. At the request of Winternitz, the O.P.A. transmitted to him a pamphlet entitled, "Approved Procedure for Auction Sales," issued by the O.P.A. October 9, 1942, which contains the following statement: "The

responsibility for establishing any other condition than 'as is' is the responsibility of the owner who must expressly invoice the item as a 'rebuilt and guaranteed' machine." This pamphlet also provided that the purchaser as well as the seller would be liable for any violation of the regulation establishing maximum prices. Another letter to Winternitz from the O.P.A., dated October 22, 1942, stated "that a machine may be sold as rebuilt and guaranteed within the meaning of Regulation 136 if it is delivered by the seller in rebuilt and guaranteed condition even if the building is not completed or even started at the time the contract is made."

As we understand this language, it means that the condition of the machine at the time it is sold by the auctioneer is immaterial provided the seller, prior to delivery, places the machine in a condition of compliance. This in itself well near precludes the idea that the auctioneer is responsible and, taken in connection with the language heretofore quoted which expressly places the responsibility upon the owner, leaves little, if any, room for doubt but that the Regulation was not intended to apply to the auctioneer. Furthermore, this is the reasonable, common sense view. If an auctioneer was responsible, it would be necessary for him to conduct his own personal investigation prior to the sale, which in the case of machinery, particularly complicated machinery, might require several days before he could take the risk of performing an auction. We think the Regulation did not intend to create such a situation, and we also think it is not capable of such construction.

■ The court made findings 11, 12, 13, 14 and 15 which we need not repeat in full. In substance, finding 11 states that the attempt of Arlington, Pelts and Winternitz to cause an investigator from the O.P.A. to examine the machines was a device by which they intended to evade the operations of Regulation 136; finding 12, that the examination of said machines by inspectors employed by Arlington was a device to evade the Regulation; finding 13, that the offer of Hart to pay "ceiling price" at the auction was a device by him intended to evade the Regulation; finding 14, that the tendering of two sets of checks by Fader and Hart was a device intended to evade the Regulation; finding 15, that the holding of numerous conferences by various defendants with the O.P.A. before and after said auction sale concerning the interpretation of Regulation 136 was a device to evade its operation.

We are compelled to reject these findings in their entirety. In our view, they are clearly erroneous. That the parties were confused as to the interpretation of the Regulation is clear, but that the O.P.A. was equally confused is just as certain. It is inconceivable that Arlington requested an inspection of its machines by an O.P.A. official and that it invited such official to be present at the sale for the purpose of evading the Regulation. It is equally inconceivable that after a refusal by the O.P. A. to make such inspection, it employed at its own expense experts for the purpose of evasion. It is far more reasonable to think it was in good faith attempting to comply. The bid of "ceiling" by Hart and the manner in which Fader and Hart tendered the purchase price may indicate the confusion and uncertainty which attended their purchase of the machines, but we are unable to perceive how such acts can be designated as a device to evade the Regulation. We think it is plain that the acts referred to in these findings were wholly consistent with good faith and a desire on the part of the parties to comply with the Regulation and not to violate it. Due to the uncertain and confused situation with which they were confronted, they took such measures as honest and prudent men would take under like circumstances to protect themselves. For this they should not be condemned.

■ The case was tried and decided by the lower court on the theory urged by the Administrator that a violation having been shown it was mandatory that an injunction issue—in other words, that the court had no discretion in the matter. In fact, the court stated this principle as a conclusion of law. The Supreme Court, in Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, subsequently decided, ruled that an injunction should issue only in the discretion of the court and not as a matter of course. This decision alone, so we think, would require a reversal in the instant case.

■ Furthermore, we think we may with propriety express the opinion that the issuance of an injunction under the facts of this record would constitute an abuse of discretion. As already concluded, the only finding which we think is supported by the record is that the defendants

violated the Regulation, Arlington by offering for sale at a public auction and Fader and Hart by bidding at such auction in excess of the maximum price. We are convinced, however, that the violation thus found was technical in its nature and, as already shown, was the result largely of an honest difference of opinion as to the proper interpretation of the Regulation. There is no proof, not even an intimation, that any of the defendants had previously violated this or any other O.P.A. regulation or that they had exhibited any hostility toward the O.P.A. or price control. The complaint does not allege that they were violating the Regulation when the complaint was filed or that they intended or were threatening to violate it in the future. It is also pertinent to observe that Arlington has been out of business since the government took over its building, and there is no claim that it is about or intends to re-enter business.

 The Administrator's effort to justify the injunction is anything but impressive. Its brief states: "If the injunction is lifted, there is grave danger that the seller will be awarded judgments in the replevin suits for amounts equal to the amounts bid at the auction. Injunctive relief is, therefore, needed to prevent the complete consummation of the illegal sales." We are of the view that this contention is wholly without merit. The only issue involved in the replevin suits is the right to possession. The price for which they were sold is not involved. Greenspahn v. Ehrlich, 277 Ill. App. 322, 329; Secs. 22, 23, Chap. 119, Ill. Rev.Stat.1943. We see no reason why a decision in the replevin suits should be precluded by an injunction of the federal court. Certainly there is no reason to assume but that the state court will decide the issue of possession in accordance with law, including O.P.A. Regulation 136, insofar as it may be material to the issue before the court.

It perhaps is somewhat beside the point but it is interesting to note that in the oral argument before this court the attorney for Arlington and the attorneys for Fader and Hart agreed that the replevin suits could be settled at once with the permission of the O.P.A. Both Fader and Hart stated that with the consent of the O.P.A., they would be willing and glad to turn the machines in their possession over to Arlington, and Arlington stated it was ready to accept.

The Administrator cites numerous cases in support of the injunction. They are all readily distinguishable and need not be discussed. In our view, it is purely fanciful to contend that an injunction will aid in the enforcement of the Act or that there is any reason to believe it will aid in compliance.

The cause is reversed and remanded for procedure in accordance with the views herein expressed.